T.C. Memo. 1995-482

UNITED STATES TAX COURT

JEROME J. AND BEATRICE A. MACK, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 30013-91.                    Filed October 4, 1995.

Jerome J. Mack, pro se.

Sherri L. Feuer, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

SCOTT, Judge:  Respondent determined deficiencies in
petitioners' Federal income taxes and additions to tax for the
calendar years 1987 through 1989 as follows:

| | | Additions to Tax | | | | | |
| Year | Deficiency | Sec. 6651(a)(1) | Sec. 6653(a)(1) | Sec. 6653(a)(1)(A) | Sec. 6653(a)(1)(B) | Sec. 6661 | Sec. 6662(a) |
|---|---|---|---|---|---|---|---|
| 1987 | $66,615 | $3,444 | -- | $4,301 | [1] | $16,654 | -- |
| 1988 | 9,269 | 262 | $512 | -- | -- | 2,317 | -- |
| 1989 | 4,885 | 1,227 | -- | -- | -- | -- | $977 |

[1] 50 percent of the interest due on $66,615 for the taxable year 1987.

All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

Some of the issues raised by the pleadings have been disposed of by agreement of the parties, leaving for decision: (1) Whether the interest of Jerome J. Mack (petitioner) in the property located at 219 South Third Street, Grand Forks, North Dakota (the Third Street property), was sold on December 28, 1987, resulting in a gain to petitioners in that year; (2) whether petitioners had discharge of indebtedness income in 1987 from satisfaction of mortgages on the Third Street property; (3) whether petitioners are entitled to a business bad debt deduction in the amount of $70,000 for the taxable year 1987; (4) whether petitioner had self-employment income subject to self-employment tax for the taxable years 1987, 1988, and 1989; (5) whether petitioners are liable for additions to tax for negligence under section 6653(a)(1)(A) and (B) for 1987 and section 6653(a) for 1988, and substantial understatement of tax under section 6661 for the years 1987 and 1988 and under section 6662 for 1989.

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioners, who resided in Grand Forks, North Dakota, at the time of the filing of their petition in this case, filed their Federal income tax returns for the taxable years 1987,

1988, and 1989 with the Internal Revenue Service Center in Ogden, Utah.

Petitioner is an attorney. For a number of years prior to 1986 and through December 1985, petitioner was engaged in the general practice of law in several different partnerships with various other attorneys.

Mr. John Moosbrugger (Mr. Moosbrugger) is an attorney who has practiced law for approximately 30 years in Grand Forks, North Dakota.

Petitioner and Mr. Moosbrugger practiced law together in a law partnership (the law partnership) from 1966 to 1972. In 1972, the law partnership was converted to a corporation. The law practice of petitioner, Mr. Moosbrugger, and sometimes others remained in corporate form for several years, but was converted back to a partnership. Over the years, other attorneys joined in the practice of law with petitioner and Mr. Moosbrugger. The attorneys included Mr. Don Leonard (Mr. Leonard), Mr. William Murray (Mr. Murray), Mr. Richard Ohlsen (Mr. Ohlsen), Ms. Shirley Dvorak (Ms. Dvorak), and Mr. Ralph Carter (Mr. Carter).

Due to the death of his son in 1985, petitioner decided that he wanted to sell his interest in the law partnership. In 1985, petitioner agreed to sell his partnership interest to other members of the law partnership.

A purchase agreement between petitioner and the law partnership (the purchase agreement) was executed by petitioner

as the seller and by Mr. Moosbrugger, Mr. Ohlsen, and Ms. Dvorak as buyers.  The purchase agreement stated in part as follows:

> WHEREAS, Seller is desirous * * * of selling his interest in the partnership known as Mack, Moosbrugger, Ohlsen & Dvorak, and the Purchasers are interested in purchasing the ownership interest of Seller, said ownership interest being 27.5 percent of all of the assets hereinafter enumerated.  Seller and Purchasers agree that the assets of the partnership are as follows:  Building and parking lot located at 219 South Third Street; work in progress including contingency fee files; accounts receivable; office furniture and equipment; the good will, name and reputation of the firm.

> NOW, THEREFORE, Seller and Purchasers herein agree that Purchaser shall pay unto Seller the following for the purchase of the Seller's share in the above-entitled partnership:

> 1.   From January 1, 1986, through December 31, 1986, Seller shall be paid $1,400 on the 15th and the 30th of the month for a total of $2,800 plus payments of Seller's Blue Cross/Blue Shield for the same period of time.

> 2.   Ten (10) percent of the fee recovered from all of the cases enumerated on the list which is attached hereto and incorporated herein as Exhibit A.

> 3.   The furniture in Seller's office, including desk, chair, table and wastebasket.

> 4.   Then (10) percent of the fee recovered from accounts receivable, namely:

> > a.   Hurtt v. Hurtt, venued in Walsh County, North Dakota;
> > b.   Don Mack;
> > c.   Duane Bye, specifically formation of a corporation with regard to a Vibrosaun.

> 5.   In return thereto, Seller shall execute a Quit Claim Deed to the partnership on the office building and parking lot described above.

6.    Seller covenants and agrees that he will not join or participate with another law firm in Grand Forks or Polk County for a duration of five (5) years.

7.    That should he be contacted with regard to cases, he will use his best efforts to refer the cases to the Purchasers.

8.    During the year 1986 Seller shall spend as much time as is practicable and reasonable for an orderly transfer and disposition of various cases including trial, if necessary.

9.    Purchasers herein agree that after said purchases, that each of the Purchasers will own said law firm equally, each owning thirty-three and one third (33 1/3) share.

Dated this 10th day of December, 1986.

The year "1986" was an error and, in fact, petitioner, Mr. Moosbrugger, Mr. Ohlsen, and Ms. Dvorak each signed the agreement in December 1985.

Mr. Carter agreed to purchase a share in the law partnership on December 13, 1985, pursuant to a purchase agreement (the Carter purchase agreement).  The Carter purchase agreement stated as follows:

THIS AGREEMENT made by and between John H. Moosbrugger, Richard A. Ohlsen, and Shirley A. Dvorak, hereinafter known as Sellers, and Ralph Carter, hereinafter known as Purchaser.

WHEREAS, Sellers are desirous of selling to Purchaser a twenty-five (25) percent interest in the partnership known as Mack, Moosbrugger, Ohlsen & Dvorak, and hereinafter the execution of this agreement to be known as Mack, Moosbrugger, Ohlsen, Dvorak & Carter, and the Purchaser is interested in purchasing the [ownership] interest offered for sale by the Sellers.

NOW, THEREFORE, Sellers and Purchaser agree as follows:

That the partnership known as Mack, Moosbrugger, Ohlsen & Dvorak consists of the following enumerated assets:

1. Building and Parking Lot located at 219 South Third Street, Grand Forks, North Dakota;

2. Work in progress including contingency fee files;

3. Accounts Receivable;

4. Office Equipment and Furniture;

5. The good will, name and reputation of the firm;

6. Accounts Payable denominated as a Purchase Agreement attached hereto as Exhibit A.

Sellers and Purchaser herein agree that Purchaser shall pay unto Sellers the sum of $36,000.00 for a twenty-five (25) percent share in the above-named partnership, which will result in ownership of the partnership as follows:

John H. Moosbrugger - 25 percent
Richard A. Ohlsen - 25 percent
Shirley A. Dvorak - 25 percent
Ralph Carter - 25 percent.

After petitioner left the law partnership, the other partners completed the cases petitioner began but was unable to complete. Petitioner received payments from the law partnership in the amounts of $36,051.54, $20,320.73, and $24,840, for the taxable years 1987, 1988, and 1989, respectively.

On their 1987 Federal income tax return, petitioners indicated that $28,870 of the income received from the law

partnership was self-employment income, although petitioners did not pay any self-employment tax for that year.

Some of the payments paid to petitioner in the years 1987 through 1989 were paid by checks issued on the law partnership's North Dakota and Minnesota trust accounts. Payments reflected in the North Dakota and Minnesota trust account ledgers indicate that they relate to specific casework, and many list the purpose of the check to petitioner as a payment for fees. Some checks issued to petitioner in 1987 and 1989 bear a notation stating "fees" or indicate that they were payable in connection with a specific individual. All of the 10-percent payments to petitioner from the law partnership were designated as fees on the partnership books.

The property located at 219 South Third Street, Grand Forks, North Dakota, was purchased by petitioner, Mr. Moosbrugger, and Mr. Murray on October 7, 1971, for $56,000. The legal description of the property conveyed was the westerly or front 140 feet of lot 14 in block 32, in Grand Forks, North Dakota. The purchasers and each of their spouses executed a mortgage in favor of the First National Bank of Grand Forks (First National Bank) on April 13, 1972, on the Third Street Property, to secure a promissory note in the principal amount of $56,000. This mortgage was satisfied on January 9, 1973. The property was purchased to be used as offices for the law partnership, and it was used for this purpose (or by the law practice when the

practice was a corporation) from the time of its acquisition throughout the years here in issue and was still being so used at the date of the trial in this case. From the time of the acquisition of the Third Street property, throughout the years here in issue, the expenses connected with the property were paid by the law partnership or the law practice when it was incorporated. On August 21, 1972, the remaining portion of lot 14 was conveyed to Murray, Mack, Moosbrugger, & Leonard, P.C. (the corporation).

Petitioner, Mr. Moosbrugger, and Mr. Murray, along with their respective spouses, each quitclaimed his interest in lot 14 to the corporation on December 28, 1972. These deeds were recorded on January 10, 1973.

By quitclaim deed dated December 28, 1972, petitioner and Mr. Moosbrugger, acting as president and secretary of the corporation, respectively, executed a mortgage on the Third Street property in favor of First National Bank, to secure the corporation's note in the principal amount of $85,000. This mortgage was satisfied in August 1978.

Even though his interest in lot 14 had been conveyed to the corporation in December 1972, Mr. Murray conveyed his interest in this property on September 11, 1974, to petitioner and Mr. Moosbrugger. The quitclaim deed was recorded 11 months later, on August 11, 1975.

On August 22, 1978, by special warranty deed, the City of Grand Forks conveyed lot 15 in block 32 in Grand Forks, North Dakota, to petitioner and Mr. Moosbrugger, doing business as Mack & Moosbrugger, a partnership (the Mack & Moosbrugger partnership).

On August 29, 1978, the Mack & Moosbrugger partnership borrowed the principal amount of $125,000 from First National Bank, which was secured by granting a mortgage on lots 14 and 15 of the Third Street property. The mortgage was executed by petitioner and Mr. Moosbrugger as partners of the Mack & Moosbrugger partnership. This mortgage was satisfied on December 31, 1987.

On August 29, 1978, when the Mack & Moosbrugger partnership borrowed the $125,000 and granted First National Bank a mortgage on lot 14 of the Third Street property, the property was actually owned by the corporation. In this mortgage, petitioner and Mr. Moosbrugger represented that the Mack & Moosbrugger partnership was lawfully seized of the real estate and had the right to mortgage the property.

As president and secretary of the corporation, respectively, petitioner and Mr. Moosbrugger conveyed the Third Street property to the Mack & Moosbrugger partnership on September 29, 1978. The deed was recorded on November 1, 1978.

On December 5, 1980, the Mack & Moosbrugger partnership executed a mortgage in favor of First National Bank on the Third

Street property to secure a note in the principal amount of $24,855.83. The note was satisfied on January 24, 1986.

On March 29, 1985, petitioner and Mr. Moosbrugger executed a mortgage on the Third Street property in favor of First National Bank to secure a promissory note in the amount of $24,007.47. The mortgagor was listed as the Mack & Moosbrugger partnership. This mortgage was satisfied on December 31, 1987.

On December 28, 1987, the Mack & Moosbrugger partnership executed a quitclaim deed of the Third Street property to Mr. Moosbrugger, Mr. Ohlsen, Ms. Dvorak, and Mr. Carter as joint tenants. The deed was recorded on January 6, 1988.

On December 31, 1987, a promissory note was executed by Mr. Moosbrugger, Mr. Ohlsen, Ms. Dvorak, and Mr. Carter in favor of Community National Bank in the amount of $150,000. The stated purpose of the note was to purchase real estate, and the note was secured by a mortgage on the Third Street property. On December 31, 1987, Mr. Moosbrugger, Mr. Ohlsen, Ms. Dvorak, and Mr. Carter executed a mortgage on the Third Street property as joint tenants in favor of Community National Bank to secure the December 31, 1987, promissory note. The December 31, 1987, note paid off prior notes and satisfied the mortgages on the Third Street property executed by the Mack & Moosbrugger partnership on August 29, 1978, and March 29, 1985, and the note executed and guaranteed by Mr. Moosbrugger and petitioner dated March 29, 1985. A real estate settlement dated December 31, 1987, reflects

payment of two mortgage notes secured by the Third Street property and the additional note executed by petitioner and Mr. Moosbrugger individually and secured by their guarantees.

On Schedule E, Supplemental Income Schedule, attached to petitioners' 1979 Federal income tax return, petitioners reported rental income in the amount of $7,114 and deducted expenses of $6,020.69 for interest and $4,331.80 for depreciation related to the Third Street property. The interest and depreciation expenses claimed were indicated to be 50 percent of the total expenses on the building.

A depreciation schedule attached to petitioners' 1987 Federal income tax return reflects that petitioners reported a one-half interest in the Third Street property and all improvements.

On Schedule E, Supplemental Income Schedule, of petitioners' Federal income tax returns for the years 1986 and 1987, they reported the following amounts in connection with the Third Street property:

| Item | 1986 | 1987 |
|------|------|------|
| Rents received | $7,425 | $7,425 |
| Expenses: | | |
| Interest | 6,542 | 6,542 |
| Taxes | 2,173 | 2,173 |
| Depreciation | 1,200 | 1,200 |

The rental income reported by petitioners for the taxable years 1986 and 1987 was 50 percent of the total rental income.

In 1987, petitioners claimed a depreciation expense of $1,200 on their Federal income tax return which brought petitioner's basis in the Third Street Property building and all improvements to zero. Petitioners claimed total depreciation expenses in the amount of $43,318 in connection with the Third Street property.

On the Schedule E attached to Mr. Moosbrugger's 1987 Federal income tax return, Mr. Moosbrugger reported rental income from the Third Street property in the amount of $7,425. He also deducted interest in the amount of $6,123, taxes in the amount of $2,183, and claimed a depreciation expense in the amount of $1,200. The rental income shown and the depreciation claimed are identical to the amounts disclosed by petitioners on their 1987 Federal income tax return. The interest and tax expenses claimed by Mr. Moosbrugger vary slightly from such expenses claimed by petitioners for the taxable year 1987.

Mr. Moosbrugger's 1988 Federal income tax return did not reflect any depreciation expenses related to the Third Street property.

On the law partnership's Form 1065, U.S. Partnership Return of Income for the year 1987, no depreciation was claimed for the Third Street Building. However, the partnership did claim an expense in the amount of $9,155 connected with a rental.

On the law partnership's 1988 Form 1065, U.S. Partnership Return of Income, income from real estate activities totaled

$3,600. On Schedule K, Partner's Shares of Income, Credits, Deductions, etc., of its Form 1065, the law partnership reflected the real estate activities income as a separate distributive share item. Forms 1065 for Mr. Moosbrugger, Mr. Ohlsen, Ms. Dvorak, and Mr. Carter reflected 25 percent of the income from the real estate activity for each of them. The law partnership reported depreciation in the amount of $4,564 related to nonresidential real property purchased in January 1988 for $150,000. No rental expenses were claimed.

On Schedule E of his 1988 Federal income tax return, Mr. Moosbrugger reported rental income in the amount of $3,822 related to the commercial building. He also deducted interest in the amount of $3,115 and taxes in the amount of $1,170. Mr. Moosbrugger claimed no depreciation expense.

Even though Mr. Ohlsen, Mr. Dvorak, and Mr. Carter were partners of the law firm in 1986, they were not reflected as the insured parties on the insurance policy covering the building at that time. The loss payees on the building as of June 1987 shown on the insurance policy were Mr. Mack, Mr. Moosbrugger, and Mr. Leonard. These were the same loss payees shown on the policy in July 1978. In July 1987, the loss payees listed on the insurance policy on the Third Street property were changed to Mr. Moosbrugger, Mr. Ohlsen, Ms. Dvorak, and Mr. Carter.

Petitioners claimed a business bad debt loss in the amount of $70,000 on their 1987 Federal income tax return. The return

identified the business as a "Newsletter for Restaurant Patrons".
The loss did not relate to any newsletter business, but instead
related to a promissory note that was executed by Mr. Richard
Kluzak (Mr. Kluzak) in favor of petitioner in the principal
amount of $70,000, dated October 6, 1986 (the promissory note).
The promissory note stated that the $70,000 principal was due on
or before October 6, 1987.  This note was for prior indebtedness
of Mr. Kluzak to petitioner which had originally been in the
amount of $120,000, on which Mr. Kluzak had paid approximately
$50,000, plus interest, in prior years.  Petitioner had no
collateral for the loan, but petitioner had investigated Mr.
Kluzak at the time the promissory note was signed and had
determined that the note would be collectible.  His investigation
included contacting a credit bureau in Fargo, North Dakota.
Petitioner determined at that time that Mr. Kluzak had net assets
worth several million dollars.  In late 1987, when the note
became due, petitioner attempted to collect from Mr. Kluzak, but
was unsuccessful.  At that time, Mr. Kluzak informed petitioner
that he had suffered several business reversals and that he did
not have any money to pay on the promissory note.  Petitioner
made some inquiries as to Mr. Kluzak's financial affairs, but
took no legal steps in an effort to collect on the note.

On February 8, 1988, creditors filed an involuntary
bankruptcy petition under chapter 7 of the Bankruptcy Code
against Mr. Kluzak in the U.S. Bankruptcy Court in the District

of North Dakota.  In the bankruptcy petition, Mr. Kluzak listed $1,280,000 in debts to secured creditors and $1,367,421 to unsecured creditors.  Petitioner was listed as an unsecured creditor in the amount of $75,000.  Mr. Kluzak listed total assets of $8,500, and listed estimated monthly income over estimated monthly expenses of $90 per month.  An order for relief was granted to the creditors on March 18, 1988.

Mr. Kluzak was discharged in the bankruptcy proceeding on October 16, 1989.  After a conversation with a clerk of the bankruptcy court, petitioner determined that if he filed a claim in the bankruptcy proceeding, his debt would not be paid and, therefore, he did not file a claim in the bankruptcy proceeding. Petitioner did not personally review the bankruptcy schedules.

Petitioner had lent money to Mr. Richard Kimble (Mr. Kimble) in the amount of $144,500 on June 8, 1976, through his wholly owned corporation, Ves Co.  Mr. Kimble deeded real estate to Ves Co. as collateral for the loan and agreed that all money handled by his real estate business would be handled through petitioner's law firm.  Petitioner also served as Mr. Kimble's attorney.

Petitioner entered into at least four business transactions with Mr. Kluzak to purchase real estate.  Petitioner and Mr. Kluzak, along with Mr. James Dickson, were partners in a North Dakota partnership known as MDK for the purpose of land investment.  MDK dissolved sometime in 1986.

On October 3, 1991, respondent mailed a notice of deficiency to petitioners for the taxable years 1987, 1988, and 1989. Respondent determined, regarding the issues still remaining for decision for the year 1987, that petitioners' income should be increased by the disallowance of the claimed bad debt deduction of $70,000. Respondent determined that petitioner realized forgiveness of indebtedness income in 1987 upon the payment of the mortgage on the Third Street property in the amount of $69,815, and since petitioner had fully depreciated the property, he had unreported ordinary income of $43,318.80; and that the remaining $26,494 was capital gain income which petitioner failed to report in 1987.

Respondent determined that petitioner's self-employment taxes for the years 1987, 1988, and 1989 were in the amounts of $5,387, $6,205, and $3,234, respectively, based on the amounts of fees the law partnership paid to him in those years under the purchase agreement.[1]

Respondent determined that petitioners were liable for additions to tax for negligence and substantial understatement of tax as set forth above for each of the years 1987 and 1988.

---

[1] On brief respondent conceded that $2,235.80, $2,409.30, and $2,643.33 of the amounts she determined to be self-employment income represented payments for health insurance of petitioner and should not have been included in self-employment income.

OPINION

The first issue for decision is whether petitioners' interest in the Third Street property was sold in December 1987, resulting in income to petitioners in that year.

In April 1972, petitioner, Mr. Moosbrugger, and Mr. Murray purchased the Third Street property for the consideration of $56,000. A lot adjacent to the Third Street property was purchased 4 months later by Murray, Mack, Moosbrugger, and Leonard, P.C. In late 1972, petitioner, Mr. Moosbrugger, and Mr. Murray each conveyed his individual interest in the property to the corporation, so that as of December 1972 the corporation held title to the Third Street property and the adjacent lot.

In August 1978, petitioner and Mr. Moosbrugger, doing business as the Mack & Moosbrugger partnership, purchased a second lot adjacent to the Third Street property. In September 1978, all real property held by the corporation (the Third Street property and the adjacent lot) was conveyed to the Mack & Moosbrugger partnership. It was not until December 28, 1987, that a deed conveying the Third Street property and the adjacent lots to the law partnership was executed by the Mack & Moosbrugger partnership.

Petitioner contends that the purchase agreement entered into in 1985 in effect transferred any interest petitioner had in the Third Street property to the law partnership and, therefore, no

gain should be recognized in 1987. Respondent contends that the purchase agreement was correctly dated December 28, 1986, that the purchase agreement was not an effective conveyance of petitioner's interest in the Third Street property, and that the requirements under the statute of frauds were not satisfied by the purchase agreement so as to permit that agreement to constitute a valid transfer of the property. Respondent maintains that the quitclaim deed dated December 1987 conveyed the Third Street property from petitioner to the law partnership, and at that time petitioner realized income from the sale of the property when his indebtedness on the property was discharged by the law partnership.

We conclude, as we have set forth in our findings, that the purchase agreement was executed on December 10, 1985. We accept the testimony of petitioner and Mr. Moosbrugger that the purchase agreement between petitioner and the law partnership was erroneously dated December 10, 1986, rather than the proper date, December 10, 1985. Mr. Moosbrugger testified that he was certain the correct date of the purchase agreement was December 10, 1985, and not December 10, 1986. Also, the language of the purchase agreement makes it clear that the correct date is sometime before January 1986. For instance, the purchase agreement states "From January 1, 1986 through December 31, 1986, Seller shall be paid". The purchase agreement further states: "During the year 1986

Seller shall spend as much time as practicable and reasonable for an orderly transfer and disposition of various cases".  That the purchase agreement between petitioner and the law partnership was executed on December 10, 1985, is further evidenced by the Carter purchase agreement, which is dated December 15, 1985.  That agreement does not list petitioner as a member of the law partnership.  Based on the evidence as a whole, we have found that the correct date of the purchase agreement is December 10, 1985.

Therefore, if as petitioner contends the purchase agreement transferred his interest in the Third Street property, the transfer occurred on December 10, 1985.  If the property was not transferred until the execution of the quitclaim deed, the transfer occurred in December 1987.

It is well settled that State law determines the nature of a taxpayer's interest in property.  Aquilino v. United States, 363 U.S. 509, 513 (1960).  Since the property at issue is located in North Dakota, that State's law is applicable.

Under North Dakota law, an interest in real property can be transferred only by operation of law or by an instrument in writing, subscribed by the party disposing of the property or by his agent.  N.D. Cent. Code sec. 47-10-01 (1978).  The requisites of an executory contract for the purchase and sale of real property, also known as a contract for deed, are that there

should be: (1) Parties capable of contracting; (2) the consent of the parties; (3) a lawful object; and (4) sufficient cause of consideration. N.D. Cent. Code sec. 9-01-02 (1987); Gerhardt v. Fleck, 256 N.W.2d 547 (N.D. 1977). Contracts are to be interpreted in a manner to give effect to the mutual intention of the parties at the time the contract was entered into. N.D. Cent. Code sec. 9-07-03 (1987); Pamida, Inc. v. Meide, 526 N.W.2d 487 (N.D. 1995). Under North Dakota law, when parties have entered into a valid, enforceable contract for the sale of land, equitable title vests in the purchaser and the seller holds bare legal title as security for payment of the balance of the purchase price. United Bank v. Trout, 480 N.W.2d 742, 748 (N.D. 1992); Zent v. Zent, 281 N.W.2d 41, 45 (N.D. 1979).

The purchase agreement provided for the sale by petitioner and the purchase by the law partnership of petitioner's share (27.5 percent) of the partnership assets which were stated to include the Third Street building and parking lot. The consideration for the sale of petitioner's partnership interest was $2,800 a month for the 12 months of 1986, certain personal property, and 10 percent of fees collected from certain cases and clients, plus payment of medical insurance for petitioner. The purchase agreement further stated that petitioner "shall execute a Quit Claim Deed to the partnership on the office building and parking lot described above."

Respondent contends that the purchase agreement merely evidenced that petitioner contemplated selling his interest in the property at some future time, while petitioner contends that the purchase agreement was a valid contract of sale of the property.

If in fact, as recited in the purchase agreement, the partnership assets included the Third Street property, the question becomes whether the purchase agreement transferred petitioner's interest in that partnership property. Certainly the facts here are not totally clear in this respect, but from the record as a whole we conclude that in December 1985 the Third Street property was an asset of the law partnership. The purchase agreement so stated as did the agreement between Mr. Carter and the law partnership, whereby Mr. Carter bought a 25-percent interest in the law partnership. In fact, if the law partnership did not own the Third Street building, it misrepresented its assets to Mr. Carter. Both petitioner and Mr. Moosbrugger testified that the Third Street property was owned by the law partnership from the time of its purchase throughout the years here in issue except when it was used by the law practice corporation. We will not discuss in detail all the conflicting evidence. However, viewing the evidence as a whole, we conclude that the Third Street property was an asset of the partnership.

We find that, under North Dakota law, petitioner effectively transferred his interest in the Third Street property in December 1985. The requirements for a valid transfer were met by the purchase agreement, including capable parties, consent to the transaction, a lawful object, and adequate consideration. We find that the purchase agreement evidenced an intent of a present transfer of petitioner's interest in the partnership property including the Third Street property from petitioner to the three other partners of the law partnership. We reject respondent's argument that the statute of frauds was violated, since the purchase agreement met the statute's requirements under North Dakota law.[2] Therefore, petitioner did not have income from the sale of the Third Street property in 1987. However, petitioner is not entitled to deduct the loss of $2,490 he claimed on the Third Street property in computing his income for 1987.

---

[2] Under the North Dakota statute of frauds provision, any agreement for the sale of real estate must be in writing. N.D. Cent. Code sec. 9-06-04 (1993). Further, the instrument must be subscribed by the party disposing of the property. N.D. Cent. Code sec. 9-06-04 (1993). The instrument must also indicate the seller, the buyer, the price, and the time of payment, and contain an adequate description of the property. Heinzeroth v. Bentz, 116 N.W.2d 611, 615-616 (N.D. 1962); Syrup v. Pitcher, 73 N.W.2d 140, 144 (N.D. 1955).

Based on the purchase agreement, we find that the statute of frauds was satisfied. See our discussion of a valid contract for deed supra.

The issue of whether petitioners had discharge of indebtedness income in 1987 from the satisfaction of mortgages on the Third Street property, or whether, as petitioner contends, any gain or loss should have been recognized in 1985 is disposed of by our conclusion that equitable ownership of the property was transferred in 1985.

Section 1001 states that the gain from a sale or other disposition of property is the excess of the amount realized over the taxpayer's adjusted basis as provided in section 1011. Section 1001(b) defines the amount realized as the sum of any money received plus property received. Liabilities assumed or paid by a purchaser are included in the amount realized by the seller on the sale. Crane v. Commissioner, 331 U.S. 1, 13-14 (1947).

Since petitioners' interest in the property was transferred in 1985 he had no income from discharge of indebtedness in 1987. When the purchase agreement was entered into, petitioner transferred to the law partnership any interest he had in the Third Street property. The law partnership at that time obtained the property, subject to any obligations thereon. The Crane case dealt with property taken subject to a mortgage, and the Court specifically stated that the amount of the mortgage debt to which the property was subject was additional consideration for the property in the year the property was transferred subject to the

mortgage. We, therefore, find that any discharge of indebtedness because of the mortgage on the property transferred occurred in 1985.

The next issue for decision is whether petitioners are entitled to a business bad debt deduction in 1987 in the amount of $70,000 because of the worthlessness of the debt evidenced by the promissory note executed by Mr. Kluzak in favor of petitioner on October 6, 1986.

Section 166(a)(1) provides that a taxpayer shall be allowed as a deduction any debt that becomes worthless within the taxable year. A loss under section 166(a)(1) is an ordinary loss deduction. Section 166(d) provides that a nonbusiness bad debt, which is defined as a debt other than one created or acquired in connection with a trade or business of the taxpayer, shall be treated as a short-term capital loss. Sec. 166(d)(1)(B).

Respondent first contends that the debt was not a bona fide debt. In order for petitioner to claim a bad debt loss under section 166, a bona fide debt must exist. A bona fide debt is a debt that arises from a debtor-creditor relationship based on a valid and enforceable obligation to pay a fixed or determinable sum of money. Sec. 1.166-1(c), Income Tax Regs. No deduction may be taken for an advance made without a reasonable expectation, belief, and intention that it will be repaid. See Zimmerman v. United States, 318 F.2d 611, 613 (9th Cir. 1963).

The determination of whether an advance was made with such an expectation, belief, and intention depends on all of the facts and circumstances, and generally no one fact is determinative. John Kelly Co. v. Commissioner, 326 U.S. 521, 526 (1946). Facts generally considered when making this determination are: (1) Whether there was a note or other evidence of indebtedness; (2) whether interest was charged; (3) whether there was a fixed schedule for repayments; (4) whether any security or collateral was requested; (5) whether there was a written loan agreement; (6) whether a demand for repayment was made; (7) whether the parties' records, if any, reflected the transaction as a loan; (8) whether any repayments were made; and (9) whether the borrower was solvent at the time of the loan. See Clark v. Commissioner, 18 T.C. 780, 783 (1952), affd. 205 F.2d 353 (2d Cir. 1953). The key factor is whether the parties actually intended and regarded the transaction as a loan. Estate of Van Anda v. Commissioner, 12 T.C. 1158, 1162 (1949), affd. per curiam 192 F.2d 391 (2d Cir. 1951). The burden is on petitioner to establish the existence of a bona fide loan.

Petitioner asserts that Mr. Kluzak borrowed $120,000 from him in the early eighties and subsequently made payments of both principal and interest. In 1986 the parties renegotiated the loan by Mr. Kluzak writing a promissory note to petitioner in the amount of $70,000.

We find that petitioner has satisfied his burden of proving a bona fide debt.  Petitioner offered into evidence the $70,000 promissory note signed by Mr. Kluzak that carried interest at 12 percent per annum.  The note provided that the principal payment was due on or before October 6, 1987.  Petitioner demanded payment from Mr. Kluzak in October 1987 when payment became due.  Petitioner testified that he investigated Mr. Kluzak's financial circumstances in late 1986 when the original loan was renegotiated and found that he had a net worth of several million dollars.  There is no contradictory evidence, and this evidence combined with the payments of interest and principal on the original note is sufficient to show that the note had value in October 1986 when it was given.

Respondent maintains that, even if the debt was bona fide, the debt was not worthless in 1987 when petitioners took the bad debt deduction.  Respondent contends that petitioner did not take the necessary steps to determine whether the debt was worthless.

Two factors must be established to support a deduction for worthlessness:  (1) The fact of worthlessness and (2) the timing of worthlessness.  The conclusions depend on the particular facts and circumstances of the case, and there is no bright-line test or formula for determining worthlessness within a given taxable year.  Lucas v. American Code Co., 280 U.S. 445, 449 (1930).  However, it is generally accepted that the year of worthlessness

is fixed by identifiable events that form the basis of reasonable grounds for abandoning any hope of recovery. Crown v. Commissioner, 77 T.C. 582, 598 (1981). To be worthless, not only must a debt be lacking current value and be uncollectible at the time the taxpayer takes the deduction, but also it must be lacking potential value due to the likelihood that it will remain uncollectible in the future. Dustin v. Commissioner, 53 T.C. 491, 501 (1969), affd. 467 F.2d 47 (9th Cir. 1972). Failure to take reasonable steps to enforce collection does not prohibit the taking of a bad debt deduction, if there is proof that such steps would be futile. Perry v. Commissioner, 22 T.C. 968, 974 (1954).

In 1987 when petitioner attempted to collect the debt from Mr. Kluzak, Mr. Kluzak stated that he was insolvent and might have to declare bankruptcy. Petitioner testified that he checked Mr. Kluzak's statements as best he could and decided that Mr. Kluzak was insolvent and his note was uncollectible. He, therefore, deducted the debt as worthless in 1987. On February 8, 1988, Mr. Kluzak's creditors filed an involuntary bankruptcy petition against him in the U.S. Bankruptcy Court, District of North Dakota. Mr. Kluzak was listed as owing $1,280,000 to secured creditors, and $1,367,421 to unsecured creditors. Petitioner was listed as an unsecured creditor in the amount of $75,000. Mr. Kluzak's total assets equaled $8,500, with estimated monthly income over estimated monthly expenses totaling

$90 per month.  After the bankruptcy petition against Mr. Kluzak was filed by his creditors, petitioner called the bankruptcy court to inquire about Mr. Kluzak's case, and he determined that Mr. Kluzak's bankruptcy was a "no asset bankruptcy" and, therefore, any attempt to collect would be pointless.  Mr. Kluzak was discharged from bankruptcy on October 16, 1989.

We find that petitioner has not produced sufficient evidence to show that the $70,000 note was totally worthless in 1987.  No identifiable event establishing its worthlessness occurred in 1987.  We conclude, however, that petitioner's $70,000 debt became worthless in 1988.  In that year, petitioner reasonably abandoned any hope of recovery after he discovered the likelihood of recovery from Mr. Kluzak's bankruptcy was nil.  It is clear from the bankruptcy petition that petitioner would never have collected any money whatsoever from Mr. Kluzak even if he had filed a proof of claim for the debt.

Petitioner maintains that he is entitled to a business bad debt deduction.

Whether a debt is a business or nonbusiness debt is a question of fact.  Sec. 1.166-5(b), Income Tax Regs.  A business bad debt deduction is available only if the taxpayer can establish that:  (1) He was engaged in a trade or business; and (2) the acquisition or worthlessness of the debt was proximately related to the conduct of such trade or business.  Putoma Corp.

v. Commissioner, 66 T.C. 652, 673 (1976), affd. 601 F.2d 734 (5th Cir. 1979); sec. 1.166-5(b), Income Tax Regs. Whether the taxpayer is engaged in a trade or business is a question of fact. Dorminey v. Commissioner, 26 T.C. 940, 945 (1956).

In Whipple v. Commissioner, 373 U.S. 193 (1963), the Supreme Court determined that a taxpayer, in order to obtain a business bad debt deduction, must establish that he was in a trade or business and that the loss from the worthless debt is proximately connected with such trade or business. The Supreme Court in that case stated that where the only return is that of an investor, the taxpayer has not met his burden of demonstrating that he is engaged in a trade or business. Whipple v. Commissioner, supra at 202; see also Millsap v. Commissioner, 387 F.2d 420 (8th Cir. 1968), affg. 46 T.C. 751 (1966).

Petitioner has not satisfied his burden of proving that he was in the business of lending money. Petitioner claimed the $70,000 loss for a restaurant newsletter business, but admitted at trial that the note had nothing to do with this business. Petitioner testified that he had made loans "many times before", but could recall only one other specific instance where he loaned money. Petitioner further testified that the loan was an "investment". Petitioner did not get a financial statement from Mr. Kluzak, though he testified that he received an oral credit reference from a credit bureau in Fargo. Petitioner asked for no

collateral from Mr. Kluzak.  We find no evidence that the loan had any connection with any of petitioner's and Mr. Kluzak's joint business transactions or with any other business entity. We, therefore, hold that the worthless debt was not a business bad debt as reported on the return, but rather resulted either from a loss on an investment or a personal loan.

Next at issue is whether petitioners are liable for self-employment tax for the years at issue.  Respondent contends that payments petitioner received after petitioner left the law partnership were subject to self-employment tax.  Petitioner's position is that the payments petitioner received were from the sale of his interest in the law partnership and, therefore, not subject to self-employment tax.

Section 1401 imposes taxes on the self-employment income of every individual.  Section 1402(b) defines self-employment income as the net earnings from self-employment derived by an individual.  Section 1402(a) defines an individual's net earnings from self-employment as the gross income derived by an individual from any trade or business carried on by such individual, reduced by income tax deductions attributable to the trade or business. Section 1402(a) specifically includes income of a general partner from trade or business income earned by his partnership.  See Ware v. Commissioner, 906 F.2d 62 (2d Cir. 1990), affg. T.C. Memo. 1989-165.  Whether a payment is derived from a trade or

business for purposes of section 1402 depends on whether, under all the facts and circumstances, a nexus exists between the payment and the carrying on of the trade or business. <u>Newberry v. Commissioner</u>, 76 T.C. 441, 444 (1981).

Based on the record, we find that at least part of the 10 percent of fees received from certain cases which was paid to petitioner by the law partnership was for the performance of services by petitioner. Petitioner was entitled to a share of fees which were earned while he was a member of the law partnership for services which he performed, but which had not been paid for at the time he left the law partnership. Further, petitioner testified that he remained "of counsel" to the law partnership. The law partnership paid petitioner out of the law partnership's trust account. This was the account from which the law partnership automatically disbursed amounts to partners when it received the funds from its clients. Petitioner has offered no evidence from which this Court can determine how much, if any, of the 10 percent of fees received from certain clients or accounts was not for services he had rendered. Accordingly, we hold for respondent on this issue.

Also at issue is whether petitioners are liable for additions to tax for negligence for the taxable years 1987 and 1988 under sections 6653(a)(1) and 6653(a), respectively. Negligence is defined as a lack of due care or a failure to do

what a reasonable and ordinarily prudent person would do under the circumstances.  Neely v. Commissioner, 85 T.C. 934, 947 (1985).

We conclude that petitioner has failed to show that the reporting of items which we have decided herein were not correctly reported, and of some items petitioner has conceded, was not due to negligence.  Petitioner relied on the advice of his accountant.  However, he testified that he did not review the returns for errors.  Further, it is clear that petitioner's accountant was not supplied with all information necessary to prepare the returns.  Petitioners took deductions for losses from property that they did not own and failed to keep adequate books and records with regard to their income from the law partnership. We, therefore, sustain the additions to tax for negligence determined by respondent.

Also at issue is whether petitioner is liable for additions to tax under section 6661 for the years 1987 and 1988, and under section 6662 for the year 1989.  Section 6661(a), applicable for the years 1987 and 1988, imposes an addition to tax of 25 percent of the underpayment attributable to a substantial understatement of income tax.  An understatement is defined as the tax required to be shown on the return less the tax shown on the return, reduced by any rebates.  Sec. 6661(b)(2).  An understatement is substantial if it exceeds the greater of 10 percent of the tax

required to be shown on the return or $5,000. Sec. 6661(b)(1)(A).

If a taxpayer has substantial authority for his tax treatment of any item on the return, the understatement is reduced by the amount attributable thereto. Sec. 6661(b)(2)(B)(i). Similarly, the amount of understatement is reduced for any item adequately disclosed either on the taxpayer's return or in a statement attached to the return. Sec. 6661(b)(2)(B)(ii).

Section 6662(a), applicable for 1989, imposes an addition to tax of 20 percent of the underpayment of tax if any portion of the underpayment is due to a substantial understatement of income tax. Sec. 6662(b)(2). "Understatement" is defined as the excess of (1) the amount of the tax required to be shown on the return for the taxable year, over (2) the amount of the tax imposed that is shown on the return. Sec. 6662(d)(2)(A). Except for items attributable to tax shelters, an understatement is reduced to the extent that it is based on an item which is adequately disclosed in the return or in a statement attached to the return or for which there is substantial authority for the taxpayer's position. Sec. 6662(d)(2)(B). A substantial understatement of income tax occurs where the amount of the understatement exceeds the greater of (1) 10 percent of the tax required to be shown on the return or (2) $5,000. Sec. 6662(d)(1).

We conclude that petitioners did not have substantial authority for their position with respect to the items we have determined against them and the items they have conceded, nor did they adequately disclose on their return facts that would have revealed the controversy with respect to those items.  If, and to the extent that the amount of understatement makes section 6661 or section 6662 applicable to petitioners, we hold for respondent on this issue.

<u>Decision will be entered under Rule 155</u>.