T.C. Memo. 2000-50


UNITED STATES TAX COURT


ALLEN C. CHAMBERLIN AND MARTHA L. CHAMBERLIN, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 1223-98.                    Filed February 11, 2000.


<u>Lorentz W. Hansen</u>, for petitioners.

<u>John Aletta</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

COHEN, <u>Chief Judge</u>:  Respondent determined the following deficiencies, additions to tax, and penalties with respect to petitioners' Federal income tax:

| | | Additions to Tax and Penalties | | | | | |
|---|---|---|---|---|---|---|---|
| Year | Deficiency | Sec. 6651(a)(1) | Sec. 6651(a)(2) | Sec. 6653(a)(1) | Sec. 6653(a)(1)(A) | Sec. 6653(a)(1)(B)[1] | Sec. 6662(a) |
| 1985 | $      0 | $     212 | $     192 | $   66 | $    — | $    — | $   — |
| 1986 | 5,282 | 2,991 | 1,572 | — | 827 | 5,282 | — |
| 1987 | 1,376 | 332 | 52 | — | 74 | 1,376 | — |
| 1988 | 2,921 | 774 | 861 | 172 | — | — | — |
| 1989 | 16,214 | 2,178 | 2,420 | — | — | — | 3,190 |
| 1990 | 41,339 | 11,067 | 12,051 | — | — | — | 8,132 |
| 1991 | 37,713 | 6,681 | 1,710 | — | — | — | 7,543 |
| 1992 | 49,979 | 9,940 | 1,254 | — | — | — | 9,954 |
| 1993 | 141,892 | 30,766 | 1,050 | — | — | — | 28,378 |

[1]50% of the interest due upon these amounts.

The issues for decision are: (1) The amount of losses sustained by petitioners from their investments in, loans made to, and loan guaranties for several pharmaceutical corporations between 1979 and 1984; (2) the years petitioners were entitled to recognize their losses; (3) whether the losses became part of the personal bankruptcy estate of petitioners; (4) the amount of carryover losses used by the personal bankruptcy estate of petitioners; (5) the character of any remaining losses; and (6) whether petitioners are liable for penalties and additions to tax for 1985 through 1993. Other issues in the statutory notice or in the petition have been abandoned by petitioners because they failed to present any evidence or argument concerning them.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference.

At the time of the filing of their petition, petitioners resided in Greenwich, Connecticut. Allen C. Chamberlin (petitioner) is a doctor of orthopedic medicine, having graduated from the Boston University School of Medicine. Petitioners filed their joint Forms 1040, U.S. Individual Income Tax Return, for 1982 through 1993 on the following dates:

| Year | Filing Date |
|------|-------------|
| 1982 | 07/11/84 |
| 1983 | 09/06/94 |
| 1984 | 09/06/94 |
| 1985 | 09/17/88 |
| 1986 | 09/17/88 |
| 1987 | 09/17/88 |
| 1988 | 04/17/95 |
| 1989 | 04/04/95 |
| 1990 | 04/17/95 |
| 1991 | 03/27/95 |
| 1992 | 03/27/95 |
| 1993 | 10/16/95 |

The initial 1985, 1986, and 1987 Forms 1040 were blank and contained no financial information. Subsequently, on December 28, 1994, petitioners filed completed Forms 1040 for these years. Petitioners reported $1,324, $11,264, $98, $521, $1,584, $7,849, $9,499, $10,450, and $11,057 of total tax on their returns for 1985, 1986, 1987, 1988, 1989, 1990, 1991, 1992,

and 1993, respectively. Petitioners prepared their returns with the help of a certified public accountant.

Pharmacare, Inc. (Pharmacare), was a Delaware corporation engaged in the business of manufacturing unit dose pharmaceutical products and packaging cosmetic products and lotions. The main manufacturing facility for Pharmacare was located in Largo, Florida (Largo facility).

During 1978, Pharmacare was in serious financial difficulty and was looking for investors to provide working capital for the company. A group of investors led by Stelios Vavlitis (Vavlitis) agreed to invest funds in Pharmacare in exchange for a controlling interest in the outstanding stock of the corporation. Vavlitis planned to rebuild Pharmacare under his management and to attract other investors to provide working capital. Vavlitis created Pharmaco Trust, which bought an 87.6-percent interest in the outstanding stock of Pharmacare and held the acquired stock for management and sales purposes. Vavlitis was made president, chief executive officer, and chairman of the board of directors of Pharmacare.

In 1978, Vavlitis persuaded petitioner to purchase three units of Pharmaco Trust for $99,000. In doing so, Vavlitis made material false representations and misstatements about his prior business experience, his educational background, Pharmacare's

ownership of patents, and the amount of competition that Pharmacare faced in the marketplace. In 1979 and 1980, Vavlitis also persuaded petitioner to make substantial unsecured loans to Pharmacare in order to keep the company running. Vavlitis failed to provide promissory notes for these loans despite repeated requests by petitioner.

On June 12, 1980, creditors of Pharmacare filed a chapter 7 involuntary bankruptcy petition against the company in the U.S. Bankruptcy Court for the Middle Division of Florida. As an unsecured creditor of Pharmacare, petitioner did not receive any payment from the Pharmacare bankruptcy to reimburse his investment or his loans. On their Form 1040, U.S. Individual Income Tax Return for 1982, petitioners deducted a loss from their Pharmacare investment and loans as a section 165 theft loss. Respondent audited the 1982 return and disallowed the loss.

On March 9, 1981, petitioner organized The Chamberlin Corporation (The Chamberlin Corp.), a Delaware corporation licensed to do business in Florida, for the purpose of continuing the Largo, Florida, operation. Petitioner became an 80-percent shareholder in The Chamberlin Corp., was elected chairman of the board of directors, and was hired as the chief executive officer. Petitioner did not receive a wage for the services he rendered in

these positions.  The Chamberlin Corp. purchased the inventory, intangible property, personal property, and equipment of Pharmacare from the trustee in bankruptcy for $200,000 and then immediately transferred ownership to petitioner.  On September 18, 1981, in a three-party agreement, petitioner purchased the Largo facility from the Pharmacare trustee in bankruptcy by giving The Chamberlin Corp. a $183,800 promissory note and assuming $572,046 of debt secured by the property.  The Chamberlin Corp. then paid $177,954 of Pharmacare debt on behalf of the trustee and $4,077 of transfer expenses.  Petitioner rented the Largo facility back to The Chamberlin Corp. from 1981 until 1984.

On November 3, 1982, petitioner obtained a personal loan from the Freedom Federal Savings & Loan Association (Freedom Federal) in the amount of $1,750,000.  This loan was secured by a first mortgage on the principal residence of petitioners in Greenwich, Connecticut.  Four hundred fifty thousand dollars of the loan proceeds was then reloaned by petitioner to The Chamberlin Corp. and used to pay off debts of The Chamberlin Corp.  The Chamberlin Corp. also obtained loans from the Ingersoll-Rand Financial Corporation (Ingersoll-Rand) in the amount of $1,800,000, personally guaranteed by petitioner, and loans in the amounts of $750,000 and $250,000, secured by second

mortgages on the Greenwich residence.  Petitioner also personally guaranteed a loan of $300,000 from Ingersoll-Rand that was made to his incorporated medical practice.

In 1983, petitioner purchased Bel-Mar Laboratories (Bel-Mar), a company whose principal purpose was the manufacture of parenteral products.  Parenteral describes liquid medication injected by syringe or needle directly into the bloodstream of a patient.  Petitioner became the sole shareholder and chairman of the board of directors of Bel-Mar, and he immediately changed the name to Chamberlin Parenteral, Inc. (Chamberlin Parenteral).

In 1984, The Chamberlin Corp. was unable to pay its debts, and, on December 17, 1984, creditors filed an involuntary chapter 11 bankruptcy petition against the company.  Petitioner continued to search for outside investments to save the company, and the company continued to operate at least through March 1985. The assets of The Chamberlin Corp., including the Largo facility that had been surrendered to the corporation by petitioner, were sold to pay debts of the company in June 1985.

On July 11, 1985, petitioners filed a personal chapter 11 petition in bankruptcy.  Petitioners did not make a section 1398(d)(2) election to terminate their taxable year on commencement of the bankruptcy.  On the date of filing, debts of petitioners totaled $6,319,354, while their assets totaled

$3,785,790. On August 15, 1985, the personal residence of petitioners was sold for $3,700,000 to satisfy creditor claims. This residence had been purchased by petitioners for $530,000. From the sale proceeds, the debt that was owed to Freedom Federal in the amount of $1,750,000 plus $550,000 in past due interest was paid in full. Ingersoll-Rand received $944,049 in partial satisfaction of its claims. The bankruptcy estate failed to file an estate tax return for 1985.

After filing their personal petition in bankruptcy, petitioners moved to California. All of their personal assets, which became the property of the bankruptcy estate, were placed in storage. Among these items were important business documents and tax records. Petitioners were unable to retrieve these documents because the bankruptcy estate failed to make the proper storage payments.

## OPINION

Petitioners bear the burden of proving that the determinations in the notice of deficiency are erroneous and that they are entitled to any deductions claimed on their returns. See Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); Welch v. Helvering, 290 U.S. 111, 115 (1933). A recurring problem for petitioners at trial was a failure to provide adequate supporting documentation and receipts to

corroborate petitioner's testimony.  The unavailability of corroborating documents does not excuse a taxpayer's failure to carry the burden of proof.  See Malinowski v. Commissioner, 71 T.C. 1120, 1124-1125 (1979).

Petitioners claim that they were the victims of theft at the hands of Vavlitis and, therefore, should be entitled to deduct their losses arising from their loans to and investment in Pharmacare as a section 165(c) theft loss.  Petitioner also claims that he engaged in the trade or business of promoting pharmaceutical companies from 1978 to 1985 and, therefore, that he is entitled to deduct any losses arising from loans to or investment in Pharmacare, The Chamberlin Corp., and Chamberlin Parenteral as section 162(a) business expenses or section 166(a) business bad debts.

In coming to a decision on the issues in this case, it is necessary to calculate the amount of losses incurred by petitioners in years predating the tax years in issue.  We do not have jurisdiction over years prior to 1985.  See sec. 6214(b).  However, the Court may consider events that occurred in prior years when such consideration is necessary to determine the tax liability for the years in issue.  See Lone Manor Farms, Inc. v. Commissioner, 61 T.C. 436, 440 (1974), affd. without published opinion 510 F.2d 970 (3d Cir. 1975).

In the capacity of a creditor, a taxpayer realizes a loss from a loan made to a corporation that becomes worthless and uncollectible. The amount of loss from a worthless loan is the adjusted basis of the promissory note representing the debt. See sec. 166. The adjusted basis of a note equals the face amount of the debt minus any principal paid back by the debtor corporation. See sec. 1.166-1, 1.1011-1, Income Tax Regs. Where a taxpayer borrows money from a third party and contributes or reloans the proceeds to a corporation, the taxpayer includes the proceeds transferred to the corporation in the basis of his stock in the corporation or in the promissory note representing the debt. The increase in basis occurs regardless of whether the taxpayer repays the third-party loan. See Brenner v. Commissioner, 62 T.C. 878, 883 (1974).

## Amount of Losses

Petitioners claim to have suffered a loss in the amount of $1,255,400 from petitioner's dealings with Pharmacare. Respondent concedes that a loss was incurred by petitioners in the amount of $414,000 but contests the occurrence of the following transfers, which petitioners claim were loans made to Pharmacare:

| Loans | Date | Amount |
|-------|------|--------|
| Wire transfer | --/--/79 | $ 25,000 |
| Checks | 10/19/79 | 10,000 |
| | 10/19/79 | 10,000 |
| | 10/19/79 | 10,000 |
| | 10/19/79 | 10,000 |
| | 10/19/79 | 10,000 |
| | 11/19/79 | 16,000 |
| | 11/21/79 | 49,500 |
| | 12/05/79 | 33,000 |
| | 12/12/79 | 45,000 |
| Third-party | 08/06/79 | 364,000 |
| loan proceeds | 08/23/79 | 35,000 |
| | 08/24/79 | 120,000 |
| | 09/12/79 | 40,000 |
| | 07/01/80 | 30,000 |
| Miscellaneous | 05/--/79 | 30,000 |
| loans | 06/--/79 | 3,900 |
| Total | | $841,400 |

Petitioners have provided five canceled checks endorsed to Pharmacare totaling $56,000.  Petitioners have also provided evidence of third-party loans made to petitioner and Vavlitis jointly in the amounts of $364,000, $35,000, and $40,000. Petitioners have shown that the proceeds from these loans were contributed or reloaned to Pharmacare by petitioner and that the loans were repaid with property of petitioner.  With respect to the remaining contested transactions, petitioners rely on a proof of claim filed in the Pharmacare bankruptcy and dated April 28, 1982.  Under the circumstances, we conclude that petitioners'

minimal documents and testimony are sufficient to substantiate the amount of loss with respect to Pharmacare.

Petitioners also claim that they are entitled to recognize losses from petitioner's contributions to The Chamberlin Corp. and Chamberlin Parenteral. To substantiate their losses, petitioners have provided only a statement of net worth, prepared in 1982, that showed that petitioners' net worth was $6,032,052. They argue that their net worth fell to zero in 1985 as a result of The Chamberlin Corp. failure, and, therefore, they should be entitled to a loss of $6,032,052. Such a statement, uncorroborated by receipts, expenses, or other documentation that reflects how assets were lost or disposed of, is insufficient for determining the amount of losses sustained by petitioners. See Henry Schwartz Corp. v. Commissioner, 60 T.C. 728, 745-746 (1973). Thus, where petitioners have failed to provide any documentation to substantiate their loss, they have failed to carry their burden of proving entitlement to deductions.

Petitioners have provided documentation relating to a loan that was made from a third party to petitioner personally and loans that were made to The Chamberlin Corp., which were secured and satisfied by personal property of petitioner. First, petitioners argue that they are entitled to recognize $1,750,000 of loss stemming from a personal loan from Freedom Federal.

Petitioner claims that he contributed or reloaned the entire amount of proceeds to The Chamberlin Corp. and Chamberlin Parenteral. Respondent argues that only $450,000 of the principal was reloaned to these corporations. Second, petitioners argue that they are entitled to losses stemming from funds that petitioner contributed to The Chamberlin Corp., which were used for operating capital and the initial purchase of the Pharmacare assets in 1981.

Of the principal amount of the Freedom Federal loan, $450,000 was reloaned to The Chamberlin Corp. and used to repay a portion of a debt owed by The Chamberlin Corp. to E.F. Hutton Credit Corporation. Petitioner testified at trial that the remaining $1,300,000 of the Freedom Federal loan was used to purchase Bel-Mar, which later became Chamberlin Parenteral, and to provide working capital or to pay debts of The Chamberlin Corp. Petitioner also testified that he contributed all of the funds used by The Chamberlin Corp. to buy the assets of Pharmacare from the trustee in bankruptcy in 1981.

Petitioner has failed to provide sufficient evidence showing that the $1,300,000 of remaining principal was reloaned or contributed to either corporation or to show how much funding, if any, he provided to The Chamberlin Corp. for the asset purchases or startup costs. There is no contemporaneous corroboration of

his generalized testimony.  Therefore, petitioners' allowable losses from their contributions or reloans of the Freedom Federal loan proceeds to The Chamberlin Corp. or Chamberlin Parenteral are no more than $450,000.

The next argument of petitioners, which respondent does not contest, is that petitioners' bankruptcy estate is entitled to a loss of $944,049 for its partial repayment of loans made by Ingersoll-Rand to The Chamberlin Corp.  The loans, which totaled $2,900,000, were repaid to the extent of $944,049 by the bankruptcy estate of petitioners.  A guarantor, such as petitioner, who pays part of a loan for a corporation in bankruptcy is deemed to have made a loan to the corporation for the amount paid to the creditor.  The loan, deemed made to the corporation, is deductible as a worthless debt.  See sec. 1.166-9, Income Tax Regs.

Timing of Losses of Petitioners

Petitioners argue that their $1,255,400 loss arising from Pharmacare should be recognizable in 1985, the year that the assets of The Chamberlin Corp. were sold in bankruptcy.  This argument hinges upon a finding that The Chamberlin Corp. and Pharmacare should be regarded as the same entity.  However, Pharmacare terminated and ceased to exist after the closing of its chapter 7 bankruptcy estate.  The Chamberlin Corp. was a

wholly separate organization that operated free and clear of Pharmacare's former debt, and any claims that petitioner had against Pharmacare were resolved with that corporation's bankruptcy discharge. The latest date when the loss would have been realized was 1982, the year petitioner filed his claim against the bankruptcy estate of Pharmacare. At that point, he had no realistic possibility of recovery. See Morton v. Commissioner, 38 B.T.A. 1270, 1278-1279 (1938), affd. 112 F.2d 320 (7th Cir. 1940); Mack v. Commissioner, T.C. Memo. 1995-482; sec. 1.165-1(d), Income Tax Regs. Therefore, the loss could only be used by petitioners as a section 172 net operating loss (NOL) carryover or capital loss carryover during the years in issue, depending on the character of the loss.

The $450,000 loss, arising from the Freedom Federal loan proceeds, was realized by petitioner in 1985. A bad debt deduction is realized in the year it becomes worthless. See sec. 1.166-1(a), Income Tax Regs. The question of when a bad debt becomes worthless is a factual question based on all of the surrounding circumstances. Although bankruptcy is a strong indicator of when a debt becomes worthless, it is not an absolute rule that a loss becomes recognizable upon the filing of a petition in bankruptcy. See sec. 1.166-2, Income Tax Regs.

Creditors of The Chamberlin Corp. filed an involuntary petition in bankruptcy against the company on December 17, 1984. However, The Chamberlin Corp. continued to operate and sought outside investment in a quest to avoid involuntary bankruptcy until at least March 1985. Until the company accepted its involuntary bankruptcy fate in 1985, there was a reasonable possibility that the company could be saved and that petitioner could recover some or all of his $450,000 loan to The Chamberlin Corp. See Morton v. Commissioner, supra at 1278.

## Personal Bankruptcy

Having decided the amount and timing of losses sustained by petitioners and the amount of losses sustained by their bankruptcy estate, the next issue for decision is the effect that petitioners' personal chapter 11 bankruptcy had on these losses.

Upon the filing of a voluntary chapter 11 petition in bankruptcy, certain tax attributes listed in section 1398(g) become property of the bankruptcy estate and are no longer tax attributes of the taxpayer. Section 1398(g) reads as follows:

> SEC. 1398(g) Estate Succeeds to Tax Attributes of Debtor.--The estate shall succeed to and take into account the following items (determined as of the first day of the debtor's taxable year in which the case commences) of the debtor--
>
> (1) Net operating loss carryovers.--The net operating loss carryovers determined under section 172.

(2) Charitable contributions carryovers.--The carryover of excess charitable contributions determined under section 170(d)(1).

(3) Recovery of tax benefits items.--Any amount to which section 111 (relating to recovery of tax benefit items) applies.

(4) Credit carryovers, etc.--The carryovers of any credit, and all other items which, but for the commencement of the case, would be required to be taken into account by the debtor with respect to any credit.

(5) Capital loss carryovers.--The capital loss carryover determined under section 1212.

(6) Basis, holding period, and character of assets.--In the case of any assets acquired (other than by sale or exchange) by the estate from the debtor, the basis, holding period, and character it had in the hands of the debtor.

(7) Method of accounting.--The method of accounting used by the debtor.

(8) Other attributes.--Other tax attributes of the debtor, to the extent provided in regulations prescribed by the Secretary as necessary or appropriate to carry out the purposes of this section.

The bankruptcy estate uses any tax attribute received from the taxpayer plus its own attributes to reduce its taxable income. See sec. 1398(g). Certain tax attributes not used by the bankruptcy estate are returned to the taxpayer upon termination of the estate. See sec. 1398(i).

From 1982 until 1985, petitioners could not use any of their $1,255,400 carryover loss from Pharmacare to reduce taxable

income.  Under section 1398(g), the bankruptcy estate received the carryover loss from petitioners upon the filing of the bankruptcy petition.  The bankruptcy estate of petitioners is also entitled to any loss arising from the payment of $141,429 of interest, the amount of interest paid by the estate that was proportional to the $450,000 loan made to The Chamberlin Corp. from the Freedom Federal loan proceeds.  Combined with the $944,049 worthless debt from the Ingersoll-Rand loan payment, the bankruptcy estate of petitioners had a combined loss of $2,340,878 available to reduce its taxable income beginning in 1985, the year the estate came into being.

The entire amount of loss is carried to the earliest taxable years to which such loss may be carried.  See Lone Manor Farms, Inc. v. Commissioner, 61 T.C. at 441.  The portion of such losses that is carried to other taxable years is the excess, if any, of the amount of loss over the sum of the taxable income for each of the prior taxable years to which such loss may be carried.  See id.  Therefore, when a taxpayer claims carryover losses for the year in issue, it is necessary to determine whether the carryover losses, claimed as a deduction for that year, are still available or were absorbed as allowable deductions in prior taxable years. See id.  A carryover loss deduction for a prior year, which would have been allowed if claimed, must be considered as actually

having been allowed when determining the availability of a loss carryover to a subsequent year.  See id.

The bankruptcy estate of petitioners did not file a tax return for 1985 and, therefore, did not use any allowable losses to offset taxable income in that year.  During the later taxable years of the bankruptcy estate, 1986 to 1994, the bankruptcy estate filed tax returns but could not use any of the carryover losses to reduce its income.

Petitioners have failed to produce the evidence necessary to calculate the taxable income of the bankruptcy estate for 1985, thus making it impossible to determine how much of the loss belonging to the bankruptcy estate was absorbed.  Because we cannot determine whether any or all of the loss was absorbed by the bankruptcy estate, we conclude that petitioners have failed to prove that any amount thereof may be carried forward to the years in issue.  However, even if we were to assume that the bankruptcy estate had no more income in 1985 than what the record before us reflects, the taxable income of the bankruptcy estate in 1985 would be more than enough to absorb completely $2,340,878 of deductible loss.

The bankruptcy trustee sold the personal residence of petitioners on August 20, 1985.  The amount realized from the sale was equal to the $3,700,000 purchase price, and the adjusted

basis was equal to the $530,000 cost basis.  Although petitioner testified that he made several improvements to the property during his years of ownership that would adjust the basis upward, he presented no supporting receipts or documentation.  Thus, the gain that was realized by the bankruptcy estate was equal to $3,170,000.  See sec. 1001(a).

Petitioners argue that the estate should be allowed to use the $125,000 one-time exclusion of gain under section 121.  However, we need not address the issue of whether the one-time exclusion is available for use by a bankruptcy estate because an election was not made by the estate under section 121(c).  An election to use the one-time exclusion must be made prior to the expiration of the period for making a claim for refund of Federal income tax for the taxable year in which the sale or exchange occurred.  See sec. 1.121-4(a), Income Tax Regs.  Any attempt by petitioners to make the election currently for the bankruptcy estate would be untimely.

The $3,170,000 of income from the sale of the personal residence in 1985 completely absorbs the $2,340,878 loss belonging to the bankruptcy estate.  Thus, petitioners would have no carryover losses surviving the estate upon its termination to reduce petitioners' income during the years in issue.  Having concluded that none of the losses belonging to the bankruptcy

estate survived 1985, it is not necessary for us to determine their character.

Section 1398(g), however, prevents certain attributes from passing from a taxpayer to the bankruptcy estate. The $450,000 loss of funds borrowed from Freedom Federal and reloaned to The Chamberlin Corp., recognizable by petitioners in 1985, was a bad debt under section 166 at the time of the filing of the personal chapter 11 petition in bankruptcy. A section 166 deduction is not specifically mentioned in section 1398(g) as being an attribute that becomes part of the estate. Because petitioners did not make a section 1398(d)(2) election to split 1985 into 2 taxable years, the section 166 deduction did not become part of an NOL upon the filing of the petition in bankruptcy. Section 1398(g) thus preserves the section 166 deduction for the debtor. The $450,000 loss was recognizable by petitioners on their 1985 tax return, and any unused portion became a carryover NOL or capital loss belonging to petitioners and is available for use by petitioners as an offset of taxable income in later years.

Character of the $450,000 Loss

Whether the $450,000 loss was a business bad debt under section 166(a)(1) or a nonbusiness bad debt under section 166(d)(2) depends on whether petitioner was engaged in a trade or business with respect to his endeavors with The Chamberlin Corp.

See Fincher v. Commissioner, 105 T.C. 126, 136 (1995).  A nonbusiness bad debt is deductible as a short-term capital loss, while a business debt is deductible as an ordinary loss.  See sec. 166.

Petitioners contend that, from 1978 until 1984, petitioner was engaged in the trade or business of promoting business ventures in the health care industry.  Respondent argues that petitioner's dominant motive for acquiring and guaranteeing loans for The Chamberlin Corp. was for investment purposes and that the activities of petitioner with regard to his promotion of business ventures do not rise to the level of a trade or business.

In order to be engaged in carrying on a trade or business, the taxpayer must be involved in the activity with continuity and regularity, and the taxpayer's primary purpose for engaging in the activity must be for income or profit.  See Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987).  Activities that are sporadic do not qualify as a trade or business.  See Polakis v. Commissioner, 91 T.C. 660, 670-672 (1988).  The management of one's own investments is not considered a trade or business no matter how extensive or substantial the investment activities might be.  See King v. Commissioner, 89 T.C. 445, 458 (1987).  Resolution of this issue requires an examination of the facts of each case.  See Commissioner v. Groetzinger, supra at 36.

In <u>Whipple v. Commissioner</u>, 373 U.S. 193 (1963), the Supreme
Court determined whether loans made by a shareholder to a
corporation, in which he held a substantial interest, were
deductible as business bad debts.  In holding that the debts were
not incurred in a trade or business of the taxpayer, the Supreme
Court stated:

> Devoting one's time and energies to the affairs of
> a corporation is not of itself, and without more, a
> trade or business of the person so engaged.  Though
> such activities may produce income, profit or gain in
> the form of dividends or enhancement in the value of an
> investment, this return is distinctive to the process
> of investing and is generated by the successful
> operation of the corporation's business as
> distinguished from the trade or business of the
> taxpayer himself.  When the only return is that of an
> investor, the taxpayer has not satisfied his burden of
> demonstrating that he is engaged in a trade or business
> since investing is not a trade or business and the
> return to the taxpayer, though substantially the
> product of his services, legally arises not from his
> own trade or business but from that of the corporation.
> Even if the taxpayer demonstrates an independent trade
> or business of his own, care must be taken to
> distinguish bad debt losses arising from his own
> business and those actually arising from activities
> peculiar to an investor concerned with, and
> participating in, the conduct of the corporate
> business.

> If full-time service to one corporation does not
> alone amount to a trade or business, which it does not,
> it is difficult to understand how the same service to
> many corporations would suffice.  To be sure, the
> presence of more than one corporation might lend
> support to a finding that the taxpayer was engaged in a
> regular course of promoting corporations for a fee or
> commission, * * * or for a profit on their sale, * * *
> but in such cases there is compensation other than the
> normal investor's return, income received directly for

>his own services rather than indirectly through the
>corporate enterprise * * *.

Id. at 202-203.  This Court has interpreted this language to mean that, in order for a taxpayer to be engaged in a trade or business of promoting business ventures, he must undertake such activity for compensation other than a normal investor's return. Such compensation must be in the form of a fee or commission or from the sale of the corporation for a profit in the ordinary course of business.  See Deely v. Commissioner, 73 T.C. 1081, 1093 (1980), supplemented by T.C. Memo. 1981-229.  Buying and selling businesses for profit can constitute a trade or business if the taxpayer shows that the entities were organized or acquired with the intent to make a quick and profitable sale after each business has become established, rather than with a view toward long-range investment gains.  See Id.

In Farrar v. Commissioner, T.C. Memo. 1988-385, this Court found that a taxpayer was engaged in the trade or business of promoting business ventures.  The taxpayer in Farrar bought and sold over 31 businesses, acquiring each one with the intent to bring in his own management staff, rebuild the company, and then sell it once the business became viable.  Of the three businesses involved for which the taxpayer was claiming losses, the taxpayer had a plan aimed at earning a profit through the sale of the business.

In Fleischaker v. Commissioner, T.C. Memo. 1999-427, this Court found that a taxpayer was not engaged in the trade or business of promoting business ventures. In Fleischaker, the taxpayer guaranteed several loans made to an adult assisted-living center so that the corporation could build its facilities and cover operating expenses. The taxpayer based his investments on his belief that the demand for adult assisted-living centers would steadily increase due to the growing population of American senior citizens. The taxpayer intended to acquire interests in multiple adult assisted-living centers throughout the country and profit from his long-term stock ownership.

Petitioner has failed to show that he acquired his business ventures with an intent to sell them in the near future for profit. Instead, petitioner testified that he intended to build The Chamberlin Corp. into a much larger corporation and to hold the corporation for an extended amount of time. Petitioner testified that his motive for engaging in The Chamberlin Corp. venture was his belief that the demand for generic pharmaceuticals would steadily increase throughout the 1980's and that anyone positioned in the generic pharmaceutical market would stand to make a large sum of money. Petitioner was not paid compensation for his services to the corporation. His activities are more analogous to those of an investor attempting to reap

profits through dividends and the increase in value of his investment than to that of a promoter who buys and sells companies as if they were inventory.  We conclude that petitioner was not in the trade or business of promoting business ventures in the health care industry.  Thus, petitioners may not deduct as a business bad debt the $450,000 loss.

We have considered all other arguments of petitioners, and they are addressed by the consideration of lack of remaining carryover losses belonging to the bankruptcy estate or otherwise lack merit.

## Additions to Tax and Penalties

Respondent determined additions to tax for failure to file tax returns under section 6651(a)(1) and additions to tax for failure to make timely payment of taxes under section 6651(a)(2). Respondent also determined additions to tax for negligence under section 6653(a)(1), additions to tax for negligence under section 6653(a)(1)(A) and (B), and accuracy-related penalties for negligence or substantial understatements under section 6662(a).

### Additions to Tax for Failure To File Timely a Tax Return and Pay Tax Liability

Section 6651(a)(1) provides for an addition to tax of 5 percent of the tax required to be shown on the return for each month or fraction thereof for which there is a failure to file, not to exceed 25 percent.  Section 6651(a)(2) provides for an

addition to tax of 0.5 percent per month up to 25 percent for failure to pay the amount shown or required to be shown on a return.  A taxpayer may fail to file and pay a tax and thus be subject to both section 6651(a)(1) and (2).  See sec. 6651(c)(1).  If that occurs, the amount of the addition to tax under section 6651(a)(1) is reduced by the amount of the addition to tax under section 6651(a)(2) for any month to which an addition to tax applies under both paragraphs (1) and (2).  The combined amounts under paragraphs (1) and (2) cannot exceed 5 percent per month.  See sec. 6651(c)(1).

To escape the additions to tax for filing late returns, petitioners have the burden of proving that the failure to file did not result from willful neglect and that the failure was due to reasonable cause.  See United States v. Boyle, 469 U.S. 241, 245 (1985).  Reasonable cause requires taxpayers to demonstrate that they exercised "ordinary business care and prudence" but nevertheless were "unable to file the return within the prescribed time."  Sec. 301.6651-1(c)(1), Proced. & Admin. Regs.

Petitioners argue that they used ordinary business care and prudence because they were acting at all times upon the advice of a certified public accountant who prepared their returns.  Petitioners also claim that, due to their financial crisis at the

time, any failure on their part to file returns or pay tax liability was unavoidable and excusable.

From 1982 to 1993, petitioners have shown a pattern of willful neglect in failing to file their Federal income tax returns in a timely manner. Although petitioners employed a paid tax preparer to prepare their returns, petitioners did not offer any evidence to show that the paid preparer was the cause of petitioners' failing to file and pay the tax shown on their returns on time. Also, petitioner is a well-educated individual who knew or should have known that a tax return was due in a timely fashion during all of the years in issue. See United States v. Boyle, supra at 249-250.

Petitioners maintain that they lost some of their financial records when they placed them in storage in 1985. Although the loss of records was an involuntary action, it does not relieve petitioners of their duty to file a timely return. See Zivnuska v. Commissioner, 33 T.C. 226, 239-241 (1959). Therefore, we sustain the determinations of respondent with respect to the section 6651(a)(1) and (2) additions to tax.

Negligence Additions to Tax and Penalties

Respondent determined negligence additions to tax or penalties for all of the years in issue. For 1985, section 6653(a)(1) imposes an addition to tax equal to 5 percent of the

underpayment if any part of the underpayment is attributable to negligence. For 1986 and 1987, section 6653(a)(1)(A) and (B) replaced former section 6653(a) but is similar in form. Section 6653(a)(1)(A) imposes an addition to tax equal to 5 percent of the underpayment if any part of the underpayment is attributable to negligence. Section 6653(a)(1)(B) imposes an addition to tax equal to 50 percent of the interest payable on the portion of the underpayment attributable to negligence. For 1988, Congress replaced former section 6653(a)(1)(A) and (B) with section 6653(a). Section 6653(a) was similar to former section 6653(a)(1)(A). Section 6653(a) imposes an addition to tax equal to 5 percent of the portion of the underpayment attributable to negligence. Section 6653(a)(1)(B), however, has no counterpart for 1988. For 1989, 1990, 1991, 1992, and 1993, section 6662 replaced former section 6653(a). Section 6662(a) and (b)(1) imposes a penalty equal to 20 percent of the portion of the underpayment that is attributable to negligence or disregard of rules or regulations. For purposes of all of these provisions, negligence is defined as a lack of due care or failure to do what a reasonable or ordinarily prudent person would do under similar circumstances. See Neely v. Commissioner, 85 T.C. 934, 947 (1985).

For the years in issue, petitioners must show that they acted reasonably and prudently and exercised due care in reporting their taxes.  See id.  Petitioners assert that their actions were not negligent, and, therefore, they are not liable for additions to tax or penalties.  They argue that they relied on the advice of a certified public accountant in calculating their tax liability during all years.

Taxpayers may satisfy their burden of proof as to negligence by showing that they reasonably relied on the advice of a competent professional adviser.  See United States v. Boyle, supra at 250-251; Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 869 (1991).  Reliance on professional advice, standing alone, is not an absolute defense but rather is a factor to be considered.

Although any reliance by petitioners on the advice of their paid preparer was unreasonable with respect to the failure to file a timely return, it was reasonable to rely on the advice of the paid preparer regarding the amount of tax liability to report during the years in issue.  The facts of this case created genuine issues as to whether petitioners are entitled to use NOL carryovers on their returns for 1985 through 1993.  Due to the complexity of the bankruptcy issues involved, it was reasonable for petitioners to rely upon the incorrect advice of their paid

preparer, who told them that they could deduct NOL's for their investments in and loans made to Pharmacare, The Chamberlin Corp., or Chamberlin Parenteral. Therefore, petitioners are not liable for negligence penalties from 1985 through 1993.

Substantial Understatement

Taxpayers are liable for penalties for substantial understatement of tax liability pursuant to section 6662(b)(2) if the understatement exceeds the greater of 10 percent of the correct tax or $5,000. See sec. 6662(d)(1)(A) and (B). The term "understatement" is defined as the excess of the amount of tax required to be shown on the return for the taxable year over the amount of tax shown on the return for the taxable year. Sec. 6662(d)(2)(A). An exception exists where the taxpayer has relied on invalid advice of a paid tax preparer if, under all circumstances, such reliance was reasonable and the taxpayer acted in good faith. See sec. 1.6662-4(g)(4), Income Tax Regs.

For the reasons previously discussed under the negligence analysis above, we conclude that petitioners' reliance on the tax liability calculated by their paid tax preparer was reasonable. Therefore, penalties for substantial understatement shall not apply.

To reflect the foregoing,

Decision will be entered

under Rule 155.